Please be seated. I see the galleries have emptied, but I'm glad the two of you are still here. I'll call the third case of the morning. Annette Rodriguez v. City of Corpus. Mr. Baines. Thank you, Your Honors, and may it please the Court. Your Honor, I represent Annette Rodriguez, who was, during the relevant time of this case, the Director of Public Health for the Health District, the Combined Health District of Nueces County and Corpus Christi. She was ultimately terminated from her position, we believe, in retaliation for things that she brought to their attention regarding pay and other matters. And the posture of this case, and she was terminated just about a month before her retirement vested. So this is a very important issue for her, and the issue as it stands now is in an odd posture because the Court granted summary judgment below, and so we have two primary issues I want to address today. One concerns the retaliation aspect of the case and whether that was proper to find that there was a valid reason excusing the termination and that there was no issue of disputed fact regarding that issue. And then the second matter that I want to focus on today, Your Honors, is the FLASA overtime, the Fair Labor Standards Act overtime issue itself and whether that was improperly denied in her content. What's odd about this case is that we have two people who were basically her employers. We look at her employment contract, which was a January 15, 2010 document at ROA 817, and it basically said that it should be noted that all employees in the city's executive pay plan should serve at the pleasure of the city manager. As director of public health, you also serve at the pleasure of the Nueces County judge. Now, so this put her up in a situation where she was boldened both to the county judge and to the city manager. That never changed throughout her employment. Her employment contract never changed. And even at the end when she was terminated, this contract was still in force. Well, of course, whatever it is, you tell me what it was, an ordinance or whatever else gets changed and the authority for this district, including hiring and firing, shifted totally to the city. So how does that fit into your? Well, Your Honor, there are several reasons that need to be addressed in that context. Judge Canales addresses that in her affidavit, and she says that and she points out a couple of things. One, that the statutory reasons for doing that and the statutory basis were in question. We think it was improper for them just to turn it over to the city. Judge Canales still remained her supervisor, though. You're trying to set aside that agreement. It does seem to me that is the operative. I'm going to have to respond to it. I don't know if it's true or not. That's the operative control over her employment is what, even though Judge Canales voted against the change, as I recall, a four-to-one decision or something like that, if I recall the event, that still was the operative control over her at the time of her termination, unless you're challenged to the legality of that, are you, in this case? Well, we have challenged the legality of that, Your Honor, and Judge Canales laid that out in her affidavit, and that was something that we voted against. You mean we're being asked to rule that that was an illegal change of authority over her employment? Well, I don't think the court has to go that far in order to, you know, in this instance we have other reasons that could lead to remand, and it's not necessary to get to that point. The issue here is that, you know, the issue here was that at the time that she was employed and up until just before she was terminated, all the decisions that were made about her employment, including pay, had to be made by both the county judge and the city manager. Mr. Vieira was asked about that during the city's deposition, and he testified as follows, but with respect to the director and assistant director of the health district, the county judge was involved and had to concur in any change in the conditions of employment with those two individuals, right? Well, yeah, when it came to, right, when it came to salary adjustments or anything of that sort because they were responsible for a portion of the payment towards the salaries, yes, they had to concur. Well, and they also had to concur in their performance evaluations too, correct? That's correct. So in terms of like what the city testified to and then Mr. Vieira's later affidavit, those two things are at odds here. That's why in our briefing we talked about it, in our briefing below and here, we talked about Mr. Vieira's affidavit as a sham because he tries to, this case is an exercise in the city running from the policies that it set itself. So that was a policy that, and it was clear in all those, at all times just up until just the day before she was terminated that the policy was that the county judge had to concur. Now, they could have changed her employment agreement but didn't. And so at the date she was terminated, it still said that the county judge had to concur. Now, with respect to the retaliation element, I just want to get into a little bit about that, Your Honors, because the court below found retaliation in this case. It found that all the elements of retaliation were satisfied and that the only issue remaining was whether there was a legitimate reason, non-discriminatory reason to fire her. That was not a pretext. Now, this is important because when we look at this case, it is clear that there is an issue, a disputed fact about that. At the very least, we believe that the affidavit was a sham because of what Mr. Vieira testified to in the city's deposition. When Mr. Vieira was asked about her performance evaluations, both for 2020, which was done in early 21, and then the final evaluation, this is what he testified, and this is at page 1458 to 1459 of the record, that those were his honest evaluations at the time. He said, does this reflect your honest evaluation of Ms. Rodriguez at the time? He was asked about that for not only the 2021, but the 2021 evaluation, and he said yes. And I said, well, was that your honest evaluation at the time on the second one for 2021? And he says this, going through the pandemic, yes. That is also the reason for my evaluation previous to this one. We were going through an unprecedented time with COVID, very unique, not just for us here in Corpus Christi, but for the United States or the world, so yes. Now, what happens in Mr. Vieira's affidavit? He goes back and he relies on documents, three documents in particular, that are hotly disputed and disputed with affidavits from Judge Canales on each one of them. The first one is a 2020 document that he doesn't talk about in the city's deposition, even though he was asked about that, but it is clear that going into those performance evaluations, Mr. Vieira and Mr. Zanoni and Judge Canales had to confer. They had to concur on what the evaluation would ultimately be, and on each one they concurred that it was a four, exceeds expectations. So now, after the fact, Mr. Vieira does his affidavit, and he relies on these pieces of evidence. He relies on a memo from 2020, from early 2020, January 29th, which is at 1129 through 1130 of the record. In this memo, he criticizes Ms. Rodriguez, and this is important for this case, because two of the bases he uses are her talking about her pay, complaining about pay, or asking for a FOIA to get information so that she can see the transparency of what they were doing to her pay, and he was saying that this was something that we should punish her for. Ultimately, they didn't do that, because they had a conference with Judge Canales, and her performance appraisal reflected a four again, and this was discarded and superseded. The second thing was a mass mandate issue that was a dispute between the county judge and the city manager at the time. This was reflected at 842 of the record. There was a reprimand by her for supporting the mass mandate in violation of Texas law, which was a silly way to portray it and wasn't her view, as she says at 839, and then Judge Canales rewarded her and issued a countermemo saying that you shouldn't have done that to her. I agreed with her approach, and that was appropriate. So here we have an issue of disputed fact at the time, and that's one of the bases that they're using. Finally, they use a hostile work environment investigation that Mr. Vieira did not even remember during his deposition, and then afterwards used it to say this is one of the bases that we're going to terminate her about. Now, they'd never given her any notice of it. They never gave her a copy of it before they terminate her. They never allowed her to address it at all, and in the fact-finding investigation itself, which is at 1123 and 1124, at 1125 of the record, it says the allegations could not be confirmed. So that's a reasonable basis? That's something deserving of credence? We would say no. So at this point, and then on top of that, that's just looking at the evidence that they looked at. When we look at Judge Canales' affidavit, that creates a plethora of conflicting facts and disputed facts. Judge Canales even says in her affidavit that there's a pretext here. That's at 788 to 790, and ultimately she says that it was inappropriate to do it that way. So ultimately we have under Muth, we have at the very least, we have conflicting affidavits, we have conflicting evidence about whether there was a pretext or not, and about whether the material that Mr. Vieira relied upon deserves credence or not as a reasonable basis. So we believe that it's a sham, but even failing that, there's an issue of disputed fact here that's clear. Finally, there's one other issue I want to address with the Court, Your Honors, and that's the issue of overtime itself. When we look at, we've already heard the testimony of the city through Mr. Vieira say that items of pay had to be agreed. To change them, there had to be an agreement between the county judge and the city manager. Now, there's a memo in the record. It's at 828 of the record. This is a memo, and with all due respect to my colleague here, their argument is that my client was exempt and was always exempt, and that's why they get to rescind this memo at will or just change it at will. That is an inappropriate basis. This memo was, in effect, up through the time Ms. Rodriguez was employed there. That's paragraph 10 of Judge Canales' memo at page 790 of the record. And so when we look at the memo, what does it say? It doesn't say exempt. It says, Exempt employees to non-exempt status during public health emergency. And then at the last sentence says, and it's signed by the human resources director, Mr. Vieira, and Mr. Zanoni, the city manager on behalf of the city. The last sentence in it says the county judge has approved for all exempt employees, all exempt county employees up until including the director level position, including those to be paid as non-exempt employees as per their emergency policy. So they're paid as non-exempt employees. Counsel, what we're looking at on your Federal Labor Standards Act case is federal law, and you're as familiar with the regulation as I am, and it establishes one exempt employee and it says you can add to that, probably for purposes very much like what happened in Corpus during special demands upon employees, additional hourly pay. So what we're really looking at is federal law, and what does federal law say about this? And if they should have continued the overtime pay, that seems to me potentially not an FLSA issue but an issue of contract or something between your client and the city. Any response to that? Well, Your Honor, I think Gentry answers that question, and I think Your Honor was on that panel in that case because they had to be paid on a salary basis. When you look at Gentry, it says the unit of time used to calculate pay is what's determinative for determining whether there's a salary basis here and whether 604A or 604B applies. And the most dispositive evidence we have is their pay records themselves. When you look at 1039 through 1055, we have the pay records there, Your Honor, and what's key, if I'm allowed to finish my thought, Your Honor, it says the unit of time used to calculate pay is the dispositive factor here. What is the unit of time in the pay records here? Hours. The unit is hours on every single entry. So when the hours are used to calculate pay, you have to look at 604B in order to figure out whether it is on a salary basis or not. All right, counsel. All right, Your Honor. I'll reserve the rest of my time. May it please the Court. Brian Miller for the City of Corpus Christi. I want to start with where opposing counsel left off, which was the FLSA salary basis issue. We cited in our briefing the FLSA opinion letter 2003-5. We cited the Magnuson case out of Wisconsin that discusses how the use of an hourly-based payroll system for issuing the paychecks and keeping track of leave time does not remove an employee from the salary basis under 541-602A. When this court decided gentry earlier this year, the court looked at a couple of cases, Anani from the Second Circuit and Coates from the Eighth Circuit, that did the same thing. In Anani, the annual base salary was divided into weekly components based on 44 hours of work a week. The employee always received that amount and then was paid on an hourly basis for time beyond the 44 hours. In Coates, as in our case, the salary basis test was satisfied, even though the annual salary was divided into bi-weekly shares based on 80 hours of work. When you have a situation where you need to track the amount of time left in leave banks, whether it be vacation leave or sick leave, you're going to have to bring in an hourly component if leave time is earned and accounted for on an hourly basis. The Department of Labor, in that FLSA opinion letter 2003-5, which is attached to our brief, explains that exempt status is not affected by having exempt employees track and enter their time, nor is it affected by identifying some hours as holiday pay, sick leave, personal leave, or using other codes. What about the memo language, if that's the right label on the document, that created this overtime and referred to, I guess, a whole range of employees, including the plaintiff, as non-exempt? All right, so the overtime memorandum is irrelevant for a couple of reasons. The first of all is that it doesn't factor into whether somebody is exempt or non-exempt. If you look at 541.2, the regulation, it states the exempt or non-exempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part. It doesn't say anything about agreements with the employee or how the employer classifies the employee. You look solely at the duties of the employee and whether the salary basis test is satisfied. There's a couple cases that we cite, the 11th Circuit opinion in Ehrlich and the Southern District of New York opinion in Clark, that exemplify this. In those cases, the employees said, look, we were paid overtime in the past. We must be non-exempt. And the courts in those cases said, look, the fact that you were paid overtime in the past is irrelevant. What matters is what is the employer doing for the time period for which you're claiming unpaid overtime, and if you're paid on a salary basis and if your duties qualify you for an exemption, you are exempt, regardless of what the employer did or said before. And that brings me to the second point on why that so-called overtime memorandum is irrelevant, and that is that we have to look at the period for which the unpaid overtime claim is made. That period started on June 12, 2021, and continued to February 28, 2022, the last day of Rodriguez's employment. During that period of time, she only received her salary. Every two-week period, she received one-twenty-sixth of her stated annual salary. She didn't receive anything more. She didn't receive anything less. So she was paid on a pure salary basis during that time period, which is the time period that matters. We also have discussed other reasons why the overtime memorandum should be disregarded. One of those is that there was nothing in the overtime memorandum that indicated an unequivocal intent to be bound to pay that amount in the future, which is a requirement for a contractual right in the employment context in Texas. Also, when you have a governmental entity, a governmental entity cannot bind itself even to a contract without a vote on the minutes of the governing body, whether it be a city council for the city of Corpus Christi or the commissioner's court for Nueces County. And a point made by the city attorney in one of the documents cited in the briefing, when he was communicating the city's position to the county attorney, was that neither of our governing bodies ever approved this overtime memorandum. But I think that the point that Judge Southwick made earlier, or asked about earlier, is an important one. What is it about this overtime memorandum that would create an FLSA right? We have federal circuit opinions and the FLSA distinguishing between voluntarily paid overtime and what's mandated by the FLSA. The fact that the city voluntarily paid overtime does not mean that the FLSA obligates it to pay overtime. I want to go next to the so-called employment contract. I want to discuss that briefly. That was a promotion letter given to Ms. Rodriguez when she went from interim health director to permanent health director. The district court issued an opinion granting the city's motion to dismiss Ms. Rodriguez's Section 1983 claim, which is the context where this employment contract came up and was argued. The district court concluded that the promotion letter from 2010 didn't create any contractual right that gave Ms. Rodriguez a property interest in her employment. The court looked at the serve at the pleasure of language and said the fact that you serve at the pleasure of two people doesn't mean that you are protected from dismissal without cause. It doesn't make it a contract. We have also argued in our briefing both in the trial court and here that there's an alternative reason, and that is there's no evidence of any vote by either the county commissioners or the city council to bind those entities to a contract with Ms. Rodriguez. Simply put, they can call it an employment contract, but as we mentioned, it lacks the indicia of a contract, such as a stated term, how it can be terminated, and it doesn't have the approvals required to be a contract. It did nothing to change the fact that she was an at-will employee. There may be some debate as to whether you need consent of both to keep her or consent of both to get rid of her, but that's not a matter of federal law on any of the Section 1983 FLSA or Title VII issues in this case. Another point I want to make regarding the Section 1983 matter is that we don't believe that there's anything regarding the Section 1983 claim that's properly before the court because that claim was dismissed on the pleadings, and there was nothing in Ms. Rodriguez's opening brief that defended the sufficiency of her pleadings. Her reply brief tries to circumvent the issue by saying that we're really complaining about her not putting the complaint in the record excerpts, but that is not what we argued in our brief. Our argument in our brief was if you're going to challenge a dismissal on the pleadings, you need to explain why your pleadings were sufficient to avoid dismissal under Rule 12b-6, which the opening brief totally failed to do. We also identified other reasons why the Section 1983 claim is not properly before the court in our brief, and we also went on and addressed the merits of the alternate theories that were asserted in the trial court and the different theory on appeal that Ms. Rodriguez put forth. Going to the pretext issue and the allegation that Assistant City Manager Steve Vieira's affidavit was a sham, the magistrate judge wrote a very detailed 73-page opinion rife with record citations and case citations. Very careful work by the magistrate judge. And the magistrate judge rejected this argument that Vieira's declaration was a sham. And it is odd to consider that a declaration could be a sham when existing documents support what's in the declaration. There was a reference to the end of 2021 performance evaluation that the city did for Ms. Rodriguez. And that performance evaluation done in January 2022, well before Steve Vieira's declaration, said such things as numerous employees have complained that Annette does not report to work daily and often works minimal hours when she is here, and Annette does not engage staff in a professional manner and often belittles or berates them. So when Steve Vieira says that during the transition process, after the city announced its withdrawal from the health district, we were hearing complaints from employees about Ms. Rodriguez's management behavior and style, it's corroborated by what he put in the performance evaluation. We mentioned the human resources evaluation or investigation report that Sherry Eldridge put together for the city. Steve Vieira was not aware of it or had forgotten it when he was deposed, but it was an existing document. The complaints about Ms. Rodriguez that were relayed to Sherry Eldridge by six employees, including Assistant Director Dante Gonzalez, Vieira said these are consistent with what employees were telling us during the transition process. There was no doubt because the evidence came from multiple sources, including a text message from City Manager Peter Zanoni that Assistant Manager Gonzalez was transferred because he had complained about Rodriguez creating a hostile work environment in the health district, and that transfer occurred in June 2021 at about the same time, if not the same time, that the overtime pay ended for both Mr. Gonzalez and Ms. Rodriguez. So you look at the body of evidence, as the magistrate judge did, and I think she was right to say that Vieira's declaration and these other pieces of evidence supplement each other. There's no contradiction here. When those investigations were done, the human resources report made, my understanding is that Rodriguez has never shown these, never asked to respond. Is that correct? That's correct. The reason why- So to use it as a legitimate justification and to counter the argument of pretext, it does seem to weaken that evidence that it's all one-sided. You also have to wonder, you know, the reason why it wasn't produced to her is not in the record, but oftentimes, you know, if HR conducts an investigation, you're not going to tell the person that's accused of creating a harassing environment, you know, who made the complaints about you and what the details were. If you leave allegations and work with the employee to try to end the hostile work practices, if it was an investigation trying to determine if there was a problem with the personnel, usually you address it with the personnel, it seems to me, with the person who is being investigated. There's no evidence in the record one way or the other about that, but with respect to Ms. Eldridge's investigation, going back in time, though, this problem had been recurring. So you look at January 2020, employee complaints were one of the reasons that factored into Assistant Manager Vieira wanting to recommend the termination of Rodriguez at that time. Now, admittedly, a couple months later, the pandemic happens. There's a different view of Ms. Rodriguez's work during the pandemic as reflected by her end of 2020 personnel evaluation. But then in 2021, a host of issues start arising regarding Ms. Rodriguez, things regarding the location of vaccination clinics and the mask mandate issue with the city not wanting to run afoul of the governor's executive order and the attorney general's stated intent to enforce that order with criminal sanctions. You had the HR investigation come up. You had the employee complaints during the transition process. So understandably, her end of 2021 personnel evaluation was different from the end of 2020 evaluation. Going back even earlier in time, you had a city auditor's report in 2015 that even had the city police department assisting in the investigation and corroborating various employee complaints about Ms. Rodriguez's behavior. So this was a recurring issue. The fact that or the omission of anything in the record regarding whether she was counseled doesn't really go to the pretext issue. Definitely, it's not something that's argued by the plaintiff. And under the party presentation principle that the Supreme Court has told us about in United States v. Sen. Smith, we've got to rely on the parties to make the arguments. And if Ms. Rodriguez doesn't make that argument, then this court can't make it for her. So I think that's something that also goes into a lot of the error preservation and briefing adequacy issues that we mentioned in our brief. As I mentioned, we've got the issues with the Section 1983 claim. We've got arguments about state statutes that aren't explained. It's just basically this is in violation of a statute, and therefore I have some property interest. There's no linkage to show how some alleged violation of a statute regarding city-county relations gives you a property interest in continued employment as an employee of that joint entity. With respect to Title VII discrimination claims, Ms. Rodriguez's summary judgment arguments did not raise any adverse action other than pay discrimination and termination. Her opening brief mentioned the change that this court's opinion in Hamilton wrought with the elimination of the former ultimate employment action standard. But her opening brief didn't assert some of these other issues as adverse actions for the purpose of her Title VII discrimination claim. She complains in a Rule 28J letter about her end of 2021 performance evaluation, about the conflicting memoranda regarding the mask mandate, and about not being informed about Sherry Eldridge's investigation. But a Rule 28J letter is too late to raise those issues. That should have been done in the opening brief. With respect to those three matters, you look at Hamilton, you look at Muldrow from the Supreme Court, which I think was earlier this year, and you have to show some harm or injury to your terms and conditions of employment. And there's never been any argument that any of these three things I just mentioned harmed Ms. Rodriguez in the terms and conditions of her employment. I also want to note that there's an attempt to maybe solicit some sympathy by arguing that Ms. Rodriguez was terminated a month before her retirement vested. This was an issue that was raised in the trial court, and we addressed it by having Steve Vieira do a declaration to which we attached documents from the retirement plan. And so she was vested in her retirement benefits. It's only a conclusory statement by Ms. Rodriguez's sister and expert witness, Patty Yon, that she was going to be vested in another month. But there was no support for that. It was totally conclusory, which also characterizes Judge Canales' affidavit, as the magistrate judge aptly observed in her memorandum and recommendation. Even on appeal, Ms. Rodriguez doesn't identify anything other than broad conclusory statements in Ms. Canales' affidavit. The affidavit lacks specific instances or examples, except for maybe perhaps the debate about the mask memoranda, which I think is explained in the briefing the city and the counties and the judge's opposing views on that. All right, counsel, thank you. Thank you, Your Honors. May it please the Court again. I want to address, I don't really understand some of the arguments that were made about that we didn't raise arguments or that we haven't addressed those arguments in our brief or Judge Canales wasn't specific enough. When you look at Judge Canales' affidavit, it gets very, very specific about these things. And two of the things it gets specific about, in particular in just a single paragraph, in paragraph 13 in the record at 791, is the mask mandate issue, which the city completely misunderstood and reprimanded her, or it misunderstood Ms. Rodriguez's position. And then Judge Canales goes in detail about why she thought the environment was hostile, why they thought they were discriminated against her. And then ultimately the issue about the performance evaluations and all this stuff, I mean they're going back to 2015 when she's gotten like exceeds expectations or a five for the seven years since that time. That is certainly a pretext. And then you have this mask mandate issue, which Judge Canales specifically responds to in paragraph 13. And then ultimately with the other issues that he raised in early 2020, including the ones where he was thinking about reprimanding her for raising questions about her pay, this is what Judge Canales says about that. Ultimately, because the city could not substantiate any actual findings on their adverse comments, the city agreed with my overall rating exceeds expectations from Ms. Rodriguez's final time period as Director of Public Health. That's the last sentence in paragraph 13. That is the issue we're talking about. Well, the judge, I think this is what I'm reading from, looked at that affidavit by Judge Canales and said that she believes the city's actions against Rodriguez were retaliatory as a result of her complaints about pay overtime, disagreed with the city's performance eval. The MJ then said beyond Canales's bare statements that the city actions and statements were retaliatory are wrong, there's nothing to support it. Now imagine we may be talking about different time frames, talking about somewhat different factual issues, but it's not just opposing counsel making that argument. That's what the magistrate judge said that, I don't know who the judge is, the judge found inadequate detail in Judge Canales's affidavit. I guess we'll just have to look at it. Well, Your Honor, I think we've given the court the documents to look at. Her enclosures are all those documents that we looked at earlier. The investigation they relied on, which they didn't show her, was itself found to be unconfirmed. And so they used that when Mr. Miller was talking about that earlier, he was talking about that same investigation that was in July that was never shown to her. She never got to address the issues. And, of course, there were heated issues. This was during the pandemic. They were working overtime all the time. And, you know, the type of what that investigation said about what the hostile work environment was, was just that it was hard. You know, that's just silly. So when Judge Canales actually had the meeting about that last performance evaluation, it was clear that the city could not support anything, and they didn't. So they ultimately agreed that it was a four at the end. And now they want to backtrack and say that that meeting never happened and that that rating never happened, even though Mr. Vieira said it did in the city's deposition. I want to address a little bit, before I run out of time here, Your Honor, about Helix. I think if we divorce all the issues about the rate of pay and just get down to what Gentry says about Helix, it is clear that in this case 604B applies. It says Helix held that 602A applies to employees paid on a weekly basis, while 604B applies to employees paid on a more frequent basis, such as hour of the day. And then it goes on. The panel in that case decided that the unit of time used to calculate pay is the controlling thing. And so if the unit of pay is hours, which it is here, then 604B applies. And that's something that can't be changed because the pay records are clear that it was by the hour. For whatever the reason they did it, because they did it whether it was exempt or not, the pay records are dispositive on that issue. And so there's no reason relationship, as they've said, and the retaliation after she complained about her overtime is gone. So with that, we ask that the clause be reversed or remanded at the Court's pleasure. And thank you for your indulgence, Your Honors. All right, counsel. Thanks to you both. That concludes our arguments for this morning. We are in recess until tomorrow at 9 a.m.